ELMER MILL, Plaintiff, Appellant, v. A. D. ROULLIARD, Defendant, Appellee.

**ASSAULT AND BATTERY: Verdict for Nominal Damages—Actual**
1 **Damages Undisputed—Consistency.** The return of a nominal verdict in an action for assault and battery implies that the jury rejected defendant's plea of self-defense, but is consistent with refusal to return verdict for actual undisputed damages, when record reveals two encounters, one being an unjustifiable assault by defendant resulting in nominal damages only, and one resulting in actual undisputed damages to plaintiff but as to which the jury might well have found in favor of defendant's plea of self-defense.

**ASSAULT AND BATTERY: Self-Defense—Statement of Rule in**
2 **Civil Cases.** It is not error to instruct in an action for damages for assault and battery, where the means used in self-defense were not extreme, that the force which defendant could lawfully use was such as "reasonably appeared to *him* to be necessary" or such as "honestly appeared *to him* to be necessary," though

such statement of the rule departs from the "reasonable man" test in cases of homicide.

*Appeal from Crawford District Court.*—HON. F. M. POWERS, Judge.

SATURDAY, DECEMBER 19, 1914.

ACTION for damages for personal injuries resulting from an alleged assault and battery. The answer was a general denial and a plea of self-defense. There was a verdict for the plaintiff for $1. Plaintiff filed a motion for new trial on various grounds. This motion was overruled and the plaintiff appeals.—*Affirmed.*

*Conner & Lally,* for appellant.

*Harding & Kahler,* for appellee.

EVANS, J.—The petition alleged that the defendant did maliciously both bite and strike the plaintiff. The defendant by his answer admitted that he did both bite and strike the plaintiff but he averred that he did the same to repel assaults on the part of the plaintiff upon the defendant and in reasonable self-defense. Fourteen grounds of reversal are laid in appellant's brief. These grounds, however, all revolve about one or two points and are so treated in appellant's argument and we shall follow the argument in our consideration of them.

The appellant as plaintiff having recovered a verdict for $1, it is urged in his behalf that this was a finding against the plea of self-defense. There was no other affirmative defense set up. It is urged, therefore, that a verdict for a nominal sum was unwarranted, the evidence of actual damage being undisputed. The plaintiff testified that his doctor bill was $15 and that he lost several days' time of the value of $25. He also testified to pain and suffering.

1. ASSAULT AND BATTERY: verdict for nominal damages: actual damages undisputed: consistency.

It was disclosed by defendant's answer and by the evidence of both parties that there were two acts in the drama. In the first part, according to the defendant, he repelled an assault of the plaintiff by a blow of his fist against the plaintiff's shoulder. He then ran away and the plaintiff pursued him. The plaintiff overtook him and jumped upon his back and got his arms around his neck and choked him. While the plaintiff was choking him, the defendant bit him upon the left arm. This was done in an effort to compel the plaintiff to release his hold upon the defendant's throat. The plaintiff admitted that he chased the defendant after the defendant struck him, but denied that he caught him. His contention as a witness was that while chasing the defendant he became entangled in some wire and that the defendant thereupon turned and assaulted him a second time. The following excerpts from the evidence of each party will be sufficient to indicate the general details of the encounter. Plaintiff testified in part as follows:

"An alley runs between my house and his and I was out in the alley on the 8th of June of last (1911). There were with me Roy and James Mill, my brothers, and James Pester. Yes, there is a building there, an ice cream house, where they make ice cream. This ice cream building is north of the street running east and west about a half a block south of my house and it is on the same side of the alley as is my father's house. There is a vacant lot between the corner and my father's place and this vacant lot runs down to the south end of the street which runs east and west on the north side of the park. I was up at the ice cream house with the boys. I quit work about five or ten minutes after six, and I had heard that this man (defendant) had been talking about me, saying I was a deadbeat and didn't aim to pay anything, didn't amount to anything and that I could not get anything around town and I just then happened to see him. When I saw him coming home, I says, 'Skinny, what did I ever do to

you'—we called him Skinny (that is a nickname) and it was what he was usually called. He said, 'You ain't done me no particular hurt,' and I said, 'You are telling around that I owe for my house rent and that I don't aim to pay anybody.' He said, 'I understand you do owe house rent.' I said, 'Whoever told you that I owe any house rent you tell them they are a liar.' He said, 'Don't you talk to me like that, don't you call me a liar,' and he hauled off and hit me and I was not expecting it and he knocked me down. As soon as I got straightened up he goes to running. I said, 'You can't hit me like that,' and I ran into some telephone wire, I got tangled up in the wire. He came at me and we both fell down and I was trying to get off. He pulled my legs around and threw me down and I supposed he was going to give me a good square pounding and he waddled around and he was on top of me and he commenced to slobber around this way and I didn't know he was trying to bite me. I supposed he was going to put 'eyes' on me, when he was over me that way, and I tried to hold him so he couldn't, and he laid over and got hold of my left arm and bit me. He just laid over and chewed.''

### CROSS-EXAMINATION.

''On this particular afternoon, June 8, 1911, I was close up to the alley and near my house when I saw Roulliard coming home from work. There were some young men with me. My brothers and a man named Pester, four of us. Yes, I came down the alley expecting to have an understanding with Mr. Roulliard as to why he made those remarks about me not. paying my debts. No, I didn't hear this from the young men that were with me. I heard it a couple of weeks before, from more than one person, and the last time more than a week previous to this evening. I did not see Roulliard in the meantime. He was working somewhere in the country, and he would not be home in the daytime. He came home at night and went to work the next morning. When I first saw him

he was on the sidewalk about a half a block west of my father's house.

"This was the first time I had seen him since I heard it, and that is why I spoke to him. He was on the sidewalk and I was not far from the sidewalk when I first spoke to him. No, I didn't reach the sidewalk before he came to me. I came so as to meet him. I was walking south, he was walking east when we met. I left my brothers and Pester making ice cream when I saw Mr. Roulliard coming. The ice cream house is not quite a half a block, just on the edge of the alley, I could not tell you how many feet from where I met the defendant. It runs about a half a block. These boys didn't come down to interfere. They stayed up there. We were not exactly in full view of the boys, but they had plenty of chance to see, nothing to stop them from seeing. He and I were not there over two minutes when he struck me and ran away. I did not entirely fall when he struck me, but I staggered back a couple of feet. I didn't expect him to strike me. Then I saw him run away. He left the sidewalk and went south while running. He tried to get away from the locality as soon as he hit me. His house was east of this place and he ran south. He didn't run very slow, he went right along. He had nothing in his hands. He left his dinner pail on the sidewalk. He put it down when he hit me first and left it sitting there behind when he ran away. When I started out for Roulliard I saw this stuff that he had left there on the sidewalk. I do not know what you would call 'a man going after a man that hit him.' I don't think I would stand there and let him hit me. There was nothing said about licking him. I didn't run to shake hands with him. I had no thought of that kind in my mind. Yes, I was mad after he hit me. There wasn't a word spoken by any of the boys that were there. I ran straight south after him."

The defendant testified in part as follows:

". . . Yes, sir, I remember the occurrence on the 8th

of June, 1911.  That night was not the starting of it.  On the seventh about 9 o'clock in the evening I got a telephone call from Mr. Mill, saying that I had said certain things.  I told him I hadn't and he said I had and that he was going to fix me and with that he hung up the receiver and said no more.  I saw him about 6:30 the next evening.  I was going home from work.  He and three others were standing in the door and he came down from his brothers and he said he wanted to see me and I told him all right I was glad to see him.  He said, 'I understand you said something about me.'  I told him that I had not said anything.  He said, 'You told that I don't pay my rent.'  I told him that I made no such statement, and that I had no such conversation, and I said to him that I did not know that he did not pay his rent.  And he went on calling me vile names and he went on and made a pass at me and I hit the gentleman and he stood there.  I was ashamed of the affair, the people were coming from the ball game and I started and ran down the hill, and he was right behind me, and I got out in the street and he ran out and jumped right on top of my back.  With that he swung me around and I grabbed him and we went down, and as we went down he put both of his hands around my neck and he didn't let me loose until his brother almost pulled me off and I was almost out of breath, and I bit him in the meantime to make him let loose.  They commenced to loosen his hold on me.  He had hold of my throat at that time and would not let go until his brother pulled him off and then I sat up in the road dazed.  I could not get my breath.  He had his hands right around my neck and I could hardly breathe.  I had to do something.  He said he was going to fix me.  He said when he had me in the road that he was going to fix me, when he had me on my back.''

From the foregoing it is apparent that the jury could have found that the first blow struck by the defendant was not justified in self-defense and that the biting by defendant of plaintiff's arm in the later encounter was justified.  No in-

jury was suffered from the blow of the fist except the nominal injury which the law would imply. The jury was, therefore, justified in allowing a nominal verdict only. Accepting the contention of the appellant that the evidence of substantial damages was not disputed as a result of the biting and that he was, therefore, entitled to substantial damages therefor, if any, it follows that the jury must have found for the defendant on that branch of the case. The evidence was abundant to justify such finding. There was, therefore, no necessary inconsistency in the verdict.

II. The trial court instructed the jury as to the degree of force which might be used in lawful self-defense. The language of the court in several of its instructions is criticised

2. ASSAULT AND
BATTERY: self-
defense: state-
ment of rule
in civil cases.

in that it presented a departure from the statement of the rule as approved in *State v. Sterrett*, 68 Iowa 76, *State v. Archer*, 69 Iowa 420. The criticism of the instructions is stated as follows: "It is not the force the defendant honestly believed was necessary to repel the attack or to protect himself from the threatened injuries but it is the force that reasonably appeared to him to be necessary at the time that he would be justified in employing." In instruction 3 it was said: ". . . he cannot, under the claim of self-defense use more force than appears to him to be reasonably necessary to defend himself, and if he does, he himself becomes the aggressor and is liable for the damage which results from the use of excessive force." In instruction 5 it was said ". . . and he would not be justified in using more force toward his assailant in repelling an attack than is necessary to his defense, as it honestly appeared to him at the time." In instruction 6 it was said: ". . . and if under all the circumstances the defendant did use more force and violence in repelling the attack of plaintiff than reasonably and honestly appears to him to be necessary, and that the plaintiff was thereby injured, then the defendant would be liable for the injuries thus inflicted." In instruction 8 it was said: " . . . and that

he used no more force than honestly appeared to him to be necessary to repel the attack or protect himself from threatened injury, then you should find for the defendant.'' In the light of the evidence in this record, the foregoing instructions furnish no ground of complaint to the appellant even though they depart somewhat from the language used in the above cited cases. It must be borne in mind that in each of the cited cases, the life of the assailant had been taken, and the question was whether the necessity of self-defense as it reasonably appeared to the defendant justified the taking of human life. In the case before us, the means resorted to in self-defense were not extreme. The only wound was a discoloration and soreness. There was no hemorrhage. The medical treatment consisted only in taking precaution against infection. If the plaintiff was the aggressor, as the jury must have found, it is hardly conceivable how he could have been stopped with less punishment. There was little occasion for a very nice weighing of the extent or degree to which the assailed party might defend himself. Indeed, assuming that the plaintiff was the aggressor, we see no ground in the evidence upon which the jury could have held that the defense was excessive.

Looking at the case on its larger merits, the fight was one of plaintiff's own choosing. If he did not actually strike the first blow he intended to do so. After two weeks of meditation and watchful waiting he chose the time and place. These were chosen with a view to his complete protection. His two brothers protected each flank and Pester was in reserve 150 feet away.. In the final encounter the brother James was a participant and according to his own testimony took hold of one of the defendant's arms ''and put my knee on his neck and pulled him off.'' The defendant was a man forty-seven years of age; the plaintiff and his brother were twenty-nine and thirty-one. The plaintiff weighed one hundred forty pounds; the defendant one hundred eighty. So one had the advantage of weight and the other of wind. The defendant

neither sought the controversy nor sought to continue it. It is conceded that he ran away. In so doing he presented to plaintiff an inglorious spectacle. This only stimulated plaintiff's courage and he gave chase; one hundred eighty pounds were not so fleet as one hundred forty. And hence the law of nature,—self-defense. There is something in the books about a worm that turned. The verdict was generous to the plaintiff and we find in the record no ground of reversal.— *Affirmed.*

LADD, C. J., WEAVER and PRESTON, JJ., concur.